**MARRIOTT INTERNATIONAL RESORTS, L.P., et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**Nos. 01–256–T, 01–257–T.**

United States Court of Federal Claims.

July 29, 2004.

Harold J. Heltzer, Crowell & Moring LLP, Washington, D.C., for plaintiffs. With him on the briefs were Robert L. Willmore and Alex E. Sadler.

G. Robson Stewart, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Eileen J. O'Connor, Mildred L. Seidman, Chief, Court of Federal Claims Section, and David Gustafson, Assistant Chief, Court of Federal Claims Section, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

These consolidated tax cases are before the Court on plaintiffs' Motion to Compel Defendant to Produce Documents Withheld or Redacted on the Grounds of Executive Privilege, filed on February 26, 2004. Plaintiffs, Marriott International Resorts, L.P. ("Partnership") and Marriott International JBS Corporation ("JBS") (collectively "Marriott"),[1] have brought this case seeking a readjustment of the Partnership's allowable tax deductions for the 1994 tax year. Marriott challenges a determination by the Internal Revenue Service ("IRS") that certain contingent liabilities derived from short-sale transactions in 1994 should have been subtracted from the Partnership's tax basis, thus increasing the Partnership's taxable income for that year by approximately $73 million. In the course of discovery, Marriott propounded requests for documents. In response to the requests, the government produced many documents but withheld or redacted 339 documents, consisting of over 4,000 pages of material, that it identified as responsive to Marriott's requests but protected from disclosure by "executive privilege." Marriott filed the pending motion to compel to challenge the government's assertion of privilege regarding these documents. The motion has been fully briefed, and a hearing was held on May 26, 2004. For the reasons set forth below, Marriott's motion to compel is granted in part and denied in part.

## BACKGROUND [2]

In 1994, Marriott engaged in two short-sale transactions of U.S. Treasury securities with the intention of hedging its exposure to interest-rate risks related to a pool of fixed-rate mortgages that Marriott had obtained in

---

1. JBS is a general partner of the Partnership and is responsible for the Partnership's tax matters for the tax year ended December 30, 1994. Compl. No. 01–257 ¶¶ 1–2. Solely for the sake of simplicity, the Court will treat plaintiffs as a unitary entity for purposes of this opinion and order.

2. The facts set forth here do not constitute findings of fact by the Court. They are drawn from the Complaint and from the recitations of the parties in their briefs and are presented merely to provide a basis for analysis of the parties' positions.

the course of conducting its time-share business. Pls.' Mot. to Compel at 5; Compl. No. 01–257–T ¶¶ 13–14. As a result of these transactions, Marriott was obligated to return the securities involved at some point in the future, after the close of the tax year. When Marriott filed its tax returns for 1994, it did not subtract the resulting "contingent liability" from the Partnership's tax basis.[3] On February 2, 2001, the IRS issued to Marriott a Notice of Final Partnership Administrative Adjustment ("Adjustment") in which the IRS determined that Marriott "realized a gain of $1,757,378 rather than a loss of $71,189,461" and, accordingly, that Marriott's taxable income for the tax year ended December 30, 1994, should have been increased by $72,946,839. Compl. No. 01–257–T, Ex. A at 6.[4]

Marriott filed suit in this Court in April 2001, challenging the IRS's determination in the Adjustment and averring that the short-sale transactions gave rise to a "contingent" rather than a "fixed" obligation that should not be considered a "liability" for purposes of determining the Partnership's tax basis pursuant to Section 752 of the Internal Revenue Code, 26 U.S.C. § 752.[5] The statute does not provide a definition for the term "liabilities." In 1988, the IRS promulgated temporary regulations, 26 C.F.R. § 1.752–1T (1989), that, by means of definitions and examples, treated obligations of the partnership as "liabilities" only to the extent they were payable in the relevant tax year. See 26 C.F.R. § 1.752–1T(d)(3)(E), (g) and (k)(Ex. 2). However, when the regulations were issued in their final form in 1991, they were greatly abbreviated, and no definition or explanation for "liabilities" was included. 26 C.F.R. § 1.752–1 (1992). Marriott alleges that prior to 1995, in Revenue Rulings directly addressing the issue, e.g., Rev. Rul. 88–77, 1988 WL 546796, the IRS consistently held that contingent obligations did not count as liabilities under Section 752. Pls.' Mot. at 12 n. 8. With Rev. Rul. 95–26, 1995 WL 95470, however, Marriott contends that the IRS reversed itself on this issue, holding even a contingent obligation to be a "liability." Id. at 7–10.

In short, Marriott argues that the relevant tax basis for 1994 should not have been adjusted by the amount of the liability in the manner that the IRS advocates. Compl. No. 01–257–T ¶ 35. Marriott asserts that its interpretation of Section 752 is supported by "decades" of practice by the IRS, Pls.' Mot. at 6, and that the IRS in 1995 "reversed course and held that the obligation to close a short sale ... would nonetheless be treated as a partnership liability under [Internal Revenue] Code section 752." Id. at 7–8.

---

3. Marriott was selling time shares and financing mortgages. To extract capital, it wanted to securitize the mortgages and offer them through a private placement. Hr'g Tr. at 4. Marriott decided to hedge its interest-rate risk for the period of time prior to the private placement. To do so, it sold short positions in Treasury securities and invested the initial proceeds of the short sales into repurchase obligations ("repos"). It then contributed the repos to the Partnership along with the obligation to close the short sales. Marriott increased its tax basis by the amount of the repos but did not decrease the tax basis by the obligation to close the short sales. Marriott ultimately recognized a tax loss of $69,442,568.

4. The Commissioner determined that the obligation of the Partnership to close the short sale was a liability within the meaning of Section 752 of the Internal Revenue Code, 26 U.S.C. § 752, or, alternatively, that the Partnership was formed with the principal purpose of reducing the present value of the partners' aggregate federal tax liability in a manner inconsistent with Subchapter K of the Internal Revenue Code.

5. In essence, 26 U.S.C. § 752(a) and (b) provide that an increase in a partner's share of the liabilities of a partnership shall be considered to be a contribution of money by the partner to the partnership, and a decrease in a partner's share of such liabilities shall be considered as a distribution of money by the partnership:

(a) Increase in partner's liabilities.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) Decrease in partner's liabilities.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Underpinning Marriott's case are its allegations that (1) at the time of the short-sale transactions at issue, the law with respect to the interpretation of the word "liabilities" in Section 752 was well established and justified Marriott's treatment of the short-sale transactions on the Partnership's 1994 tax returns, and (2) the IRS improperly chose in 1995 to reinterpret Section 752 without advance notice and to Marriott's detriment. In pursuit of support for these allegations, Marriott on June 10, 2002, requested from the government all documents relied upon by the IRS "in formulating its position with respect to the definition of 'liability' in Treasury Regulations issued under [Internal Revenue] Code section 752 in 1988 and 1991 and various revenue rulings in which the IRS purported to define the term." Pls.' Mot. at 9–10. *See also* Pls.' App. Ex. C, Tab 1, ¶¶ 20–21 (Pls.' First Request for Production of Documents (June 10, 2002)).

In response to Marriott's document requests, on July 18, 2002, the government produced some documents along with a forty-one page privilege log indicating documents that were being withheld or redacted under a claim of "executive privilege." Pls.' App. Ex. C, Tab 3. Six and one-half months later, the government provided an amended privilege log that was forty-seven pages in length. *Id.*, Tab 10.[6] A further two months later, on April 9, 2003, the government provided to Marriott a ninety-one page Declaration of Margo L. Stevens ("Declaration") in support of its assertions of executive privilege. Pls.' App. Ex. D. At the time she provided her Declaration, Ms. Stevens served as Assistant Chief Counsel (Disclosure and Privacy Law) in the Office of Associate Chief Counsel (Procedure and Administration), Office of Chief Counsel, IRS. *Id.* ¶ 1. In her Declaration, Ms. Stevens averred that she had "been delegated the authority to claim executive privilege on behalf of the [IRS] with respect to its documents or information in actions before this Court" pursuant to "Delegation Order

No. 220 (Rev.3), 1997 WL 33479282, signed by the Commissioner of Internal Revenue and effective April 16, 1997." *Id.* ¶ 2. The Declaration sets out the standards applied by Ms. Stevens in reaching her decision to claim executive privilege, *id.* ¶¶ 2, 8–9, and identifies and explains the search methods used by attorneys for the IRS in locating and identifying documents the government wished, and still wishes, to withhold. *Id.* ¶¶ 5–6. The Declaration further describes each document or group of documents over which Ms. Stevens claims executive privilege, *id.* at 159–240, and asserts that "[t]he production of the documents, or the withheld portions thereof . . ., would inhibit the frank and honest discussion of legal and policy matters, and thus would adversely affect the quality of the Service's decisions and policies." *Id.* ¶ 11. The documents and portions of documents as to which the government asserts executive privilege are, for the most part, memoranda and notes written by various staff members that reflect opinions and recommendations regarding changes in regulations as well as draft versions of proposed regulations. *Id.* at 159–240. *But see infra,* at 420 n. 13.

## DISCUSSION

### *Timeliness*

█ As a preliminary matter, the government argues that Marriott's motion to compel should be denied on the basis that it was untimely filed. Def.'s Opp'n at 5–7. Specifically, the government points to the circumstances that fact discovery closed on August 29, 2003, and expert discovery closed on January 29, 2004, but Marriott did not file its motion to compel until February 26, 2004. *See id.* at 5–6. The government contends that Marriott's delay in filing its motion places an undue burden on its shoulders because the trial attorney who originally assisted in the preparation of Ms. Stevens's Declaration "is no longer in government service and the IRS personnel involved would be

---

**6.** The privilege log dated February 3, 2003, identifies eight documents that were withheld on the basis of attorney-client privilege or the attorney work-product doctrine. Pls.' App. Ex. C, Tab 3 at 101. Marriott does not challenge the withholding of such documents. This log also lists

numerous documents that are not accompanied by a privilege designation. *See, e.g., id.* at 102. Marriott has not addressed these documents in its motion, and the Court assumes that they have been produced.

required to expend considerable resources to re-familiarize themselves with the details of the executive privilege claim for each document." *Id.* at 7. For its part, Marriott argues that neither this Court's rules nor the Court's prior orders establish a deadline for the filing of this motion, that the government is not truly prejudiced, and that the government's position with regard to timeliness is "the mirror opposite" of the position taken by the Tax Division of the Department of Justice in other cases in which the government has filed motions to compel after the close of discovery. Pls.' Reply at 16–20.

The Court finds the government's arguments in this respect unavailing. No deadlines have yet been established in this case either for the filing of motions to compel discovery or for the submission of dispositive motions. Any hardship on the government is minimal. Much of the delay associated with this dispute stems from time taken by the IRS to prepare an amended privilege log and to provide an assertion of executive privilege. *See supra,* at 414. Also, there has been no suggestion or showing that the person arguably most familiar with the documents at issue, Ms. Stevens, is no longer employed by the IRS. In a similar vein, the Department of Justice appears to have rotated responsibility for this case to a new trial attorney before the motion to compel was even filed, for reasons that have nothing to do with the pending motion, so difficulties associated with the exit of the original attorney assigned to the case cannot be ascribed to the filing of the motion to compel. Moreover, in light of the Court's conclusions, *infra,* regarding the assertion of privilege, the government could have, and should have, avoided any burden engendered by the motion by using a proper means to assert its privilege claims in the first instance.

### Relevance

■ The government contends that, regardless of its own assertion of privilege over the documents at issue, the documents sought by Marriott are not actually relevant to this case. Def.'s Opp'n at 7–16.[7] Marriott contends that the requested documents are necessary to shed light on the IRS's interpretation of the relevant statute and to show how that interpretation changed with time. Pls.' Reply at 8–11. For its part, the IRS argues that, rather than looking to the opinions or comments contained in unpublished documents about regulations that were ultimately issued in final form, the Court should restrict its consideration to the final regulations and rulings that the IRS actually published. Def.'s Opp'n at 13–16.

As a general matter, Rule 26(b)(1) of the Rules of the Court of Federal Claims ("RCFC") provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." [8] "The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed.R.Civ.P. 26 advisory committee note (1983 amend.) (citing *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.")). A somewhat similar set of claims to those now being advanced by Marriott was raised in *Vons Cos. v. United States,* 51 Fed.Cl. 1 (2001), and the government raised a nearly identical objection as to relevance. In *Vons,* the plaintiff challenged the IRS's disallowance of

---

7. In its initial response to Marriott's document requests, the government objected to fifteen of Marriott's twenty-one requests on the ground of relevance. Pls.' App. Ex. C, Tab 2 (Def.'s Resp. to Pl.'s First Request for Production of Documents (July 15, 2002)). For those requests to which it did not raise this objection, the government stated that it had either "already produced" all responsive documents (request 8) or that it had no responsive documents (requests 9–12). *Id.* at 23–24.

8. In all pertinent respects, the Rules of this Court were amended in 2002 to mirror the Federal Rules of Civil Procedure insofar as possible. Fed.R.Civ.P. 26 was amended in 2000 to change the scope of discoverable material, limiting discovery as of right to matters "relevant to the claim or defense of any party." "Prior to the 2000 amendments, the parties were entitled to discovery of any information that was not privileged so long as it was relevant to the 'subject matter involved in the pending action.'" 6 James Wm. Moore, *Moore's Federal Practice* § 26.41[2][a] (3d ed.2003) (quoting Fed.R.Civ.P. 26(b)(1) advisory committee's note (2000 amend.)).

certain deductions and sought the production of various IRS and Treasury Department documents relating to a particular Revenue Ruling, including "documents relating to the ongoing consideration, reconsideration, development, interpretation or application" of that Ruling. *Id.* at 4. Determining that there, as here, conflicting interpretations of the law might constitute an important framework for the matters at issue, the court in *Vons* determined that the requested files were relevant to the case. *Id.* at 21.[9] Specifically, background files to the IRS's final actions, just as a statute's legislative history, might "prove[ ] informative," particularly "in sounding a note of caution." *Id.* Nonetheless, the court commented that in treating such documents, it must "be extraordinarily hesitant to attribute to the IRS or the Treasury Department interpretations of a revenue ruling made by individual IRS employees that represent their personal views, rather than the official position of the agency." *Id.* Likewise, in this case, the parties are preparing to ask the Court to evaluate different interpretations of the law that have been applied at different points in time. Accordingly, the documents sought by Marriott are relevant to this case, and the government's objection on this ground is rejected.

### Executive Privilege

Discovery of relevant matters will be constrained if a privilege protects the requested items from disclosure. Federal courts have long recognized the necessity of the federal government to be able to withhold certain categories of documents from disclosure in the context of litigation. *See, e.g., Cheney v. United States Dist. Court for the Dist. of Columbia,* —— U.S. ——, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004); *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Judicial Watch, Inc. v. Department of Justice,* 365 F.3d 1108 (D.C.Cir.2004); *Zenith Radio Corp. v. United States,* 764 F.2d 1577 (Fed.Cir.1985); *Kaiser Aluminum & Chem. Corp. v. United States,* 141 Ct.Cl. 38,

157 F.Supp. 939, 946 (1958). A unique category of privilege exists for the federal government that is not available to a private litigant. This privilege has received different labels in different circumstances by different courts but is generally referred to as the "executive privilege," and the government has sought to invoke it here in that guise. Depending upon the context and the court, the executive privilege may be thought of as having three different components. One aspect of the privilege relates to the executive branch's unique position with regard to the nation's security and foreign affairs and is frequently referred to as the "state secrets" doctrine or "state secrets privilege." *See EPA v. Mink,* 410 U.S. 73, 81–84, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). This doctrine calls for great deference by the courts in protecting classified information but is not at issue in this case. A second aspect of the privilege has been reserved to the President and his senior advisors. This "presidential privilege" is derived in part from constitutional principles of separation of powers and is intended to preserve the President's ability to seek and obtain "complete candor and objectivity from advisers." *United States v. Nixon,* 418 U.S. 683, 706, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). *See also Cheney,* —— U.S. at ——, 124 S.Ct. at 2587–88; *Judicial Watch,* 365 F.3d at 1114–24. This doctrine, likewise, is not at issue in this case.

■ The third aspect of the executive privilege, pertinent to this case, is a close cousin of the second and relates to documents that reflect the deliberative processes of government agencies. The "deliberative process" doctrine serves to protect "inter- and intra-agency deliberative communications or official information, [and other] 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *CACI Field Servs., Inc. v. United States,* 12 Cl.Ct. 680, 686 (1987) (quoting *Carl Zeiss, Stiftung v. V.E.B. Carl Zeiss, Jena,* 40

---

**9.** *See United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 220, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) ("substantial judicial deference" accorded to the IRS's reasonable "longstanding interpretations of its own regulations").

*Compare American Express Co. v. United States,* 262 F.3d 1376, 1382 (Fed.Cir.2001) (applying deference), *with Florida Power & Light Co. v. United States,* 375 F.3d 1119 (Fed.Cir.2004) (deference not due).

F.R.D. 318, 324 (D.D.C.1966)). The principal rationale underpinning this aspect of the privilege is similar to that for the presidential privilege—"to promote frank discussion of legal or policy matters in the decision-making process"—though it may be applied to a wider range of documents created at lower levels of the government. *Zenith,* 764 F.2d at 1580. *See also Mink,* 410 U.S. at 87, 93 S.Ct. 827 ("There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action.") (quoting *Kaiser Aluminum,* 157 F.Supp. at 946).

■ In this Court and its predecessors, invoking the deliberative-process prong of the executive privilege to withhold documents from discovery has long required adherence to certain requirements. *See Walsky Constr. Co. v. United States,* 20 Cl. Ct. 317, 320 (1990). First, the assertion of the privilege must be made by the head of the relevant agency in the form of an affidavit or declaration after personal consideration. *Id.* at 320 & n. 3. Second, the head of the agency "must state with particularity what information is subject to the privilege." *Id.* at 320. And third, "the agency must supply the court with 'precise and certain reasons' for maintaining the confidentiality of the requested document[s]." *Id.* (quoting *Mobil Oil Corp. v. Department of Energy,* 102 F.R.D. 1, 6 (N.D.N.Y.1983)).[10]

■ In this case, the government has abjured the procedural requirement that the executive privilege be invoked by the head of the agency. The Commissioner of the IRS did not make the pertinent declaration, but rather, Ms. Stevens, an Assistant Chief Counsel in the IRS's Office of Associate Chief Counsel, has asserted the privilege. *See supra,* at 414. The government argues that *who* invokes the privilege should not be a determinative factor and that the head of the agency should be allowed to delegate the

authority to invoke. Def.'s Opp'n at 18–25. This position is not tenable in light of directly applicable precedent binding on this Court.

The role of an agency head in invoking the deliberative-process doctrine within the executive privilege was addressed by the Court of Claims in *Cetron Electronic Corp. v. United States,* 207 Ct.Cl. 985, 1975 WL 6632 (1975), when the IRS sought to withhold seven documents from discovery based upon an assertion of "governmental privilege" (which, substantively, mimicked the deliberative-process doctrine) made by an agency attorney rather than the Commissioner of the IRS. The court rejected the attempt to invoke privilege, noting that the government had not "assert[ed] the doctrine of executive privilege which can be personally invoked only by the head of a department or agency." *Id.* at 989. *Cetron* was consistent with an earlier decision by the Court of Claims in *Kaiser Aluminum,* which upheld an assertion of executive privilege to withhold an advisory opinion when the privilege was asserted by the Administrator of the General Services Administration. 141 Ct.Cl. 38, 157 F.Supp. 939. Since *Cetron,* this Court has regularly required that executive privilege be invoked only by the heads of agencies after personal familiarization with the documents involved and a determination that disclosure would significantly and adversely affect the agency's vital functions. *See, e.g., Vons,* 51 Fed.Cl. at 23 (requiring submission of a formal invocation of the privilege by the Commissioner of the IRS); *Abramson,* 39 Fed.Cl. at 295 (upholding privilege); *Walsky,* 20 Cl.Ct. at 320 & n. 3 (rejecting assertion of privilege); *Deuterium Corp. v. United States,* 4 Cl.Ct. 361, 364 (1984) (government "properly invoked the executive privilege by submitting the affidavit of Acting Secretary [of Energy]"). *Cetron* is also consistent with a decision by a sister court in *SCM Corp. v. United States,* 82 Cust.Ct. 351, 473 F.Supp. 791, 797 (Cust.Ct. 1979).[11]

---

10. In addition to these procedural requirements, a proper invocation of executive privilege will apply substantively only to "pre-decisional" materials that are "deliberative in nature, containing opinions, recommendations, or advice pertaining to agency decisions."

*Abramson v. United States,* 39 Fed.Cl. 290, 294–95 (1997).

11. There is a conflict on this issue among the various federal courts. The Federal Circuit, based on its precedent inherited from the Court of Claims, adheres to the requirement of person-

The Federal Circuit itself has not directly addressed the issue of whether the head of an agency may delegate the authority to invoke the privilege. The government argues that this Court should follow the ruling of the Temporary Emergency Court of Appeals ("TECA") in *Department of Energy v. Brett,* 659 F.2d 154 (Temp.Emer.Ct.App.1981). Def.'s Opp'n at 19–21. In *Brett,* TECA held that a district court had erred in ruling that the deliberative-process privilege could only be invoked by the head of the agency. In reaching this conclusion, TECA drew upon the D.C. Circuit's ruling in *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), an important decision for interpretation and application of the Freedom of Information Act, 5 U.S.C. § 552. Congress abolished TECA in 1992 and transferred its caseload to the Federal Circuit. *See* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, Sec. 102(d), (e) 106 Stat. 4506, 4507 (codified in relevant part at 28 U.S.C. § 1295 note). For cases so transferred, the Federal Circuit directly adopted as precedents the decisions of TECA. *See Texas Am. Oil Corp. v. Department of Energy,* 44 F.3d 1557, 1561 (Fed.Cir.1995) (en banc). The government argues that *all* of TECA's precedent should thus be considered binding precedent upon this court. Def.'s Opp'n at 19–20 & n. 20.

However, the government's argument disregards the care and precision the Federal Circuit used in clarifying that it adopted TECA's precedents solely for cases inherited from TECA. "To remove uncertainty and avoid disruption of cases still in process, we emphasize that TECA precedent continues to apply to questions of jurisdiction, *in the cases that reach the Federal Circuit as successor to the TECA.*" *Texas American,* 44 F.3d at 1561 (emphasis added). *See also id.* ("*As foundation for decision of the cases transferred to this court in accordance with Pub.L. No. 102–572,* the Court of Appeals for the Federal Circuit adopts as precedent the body of law represented by the holdings of the [TECA]." (emphasis added)). Accordingly, there is no basis for interpreting the Federal Circuit's inheritance of the TECA cases as providing a circuitous route for holding *Brett* and by extension *Vaughn* to be binding precedent upon this Court and thus deviating from the precedent established by *Cetron* and *Kaiser Aluminum.*

The government points to one instance in this court in which delegation of the authority to invoke executive privilege has been allowed. *Yankee Atomic Electric Co. v. United States,* 54 Fed.Cl. 306, 309 (2002), was a decision upholding the assertion of privilege by the Chief Operating Officer of the

---

al invocation of executive privilege by the head of the agency, established by the Supreme Court in *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953). This requirement has likewise been adopted by the Third Circuit, *see United States v. O'Neill,* 619 F.2d 222 (3d Cir.1980), and has been followed by trial courts in that circuit. *See Scott Paper Co. v. United States,* 943 F.Supp. 501 (E.D.Pa.1996). Trial courts in the First Circuit, *United States v. Salemme,* 1997 WL 810057 (D.Mass. Dec.29, 1997), and in the Eighth Circuit, *Nelson v. Production Credit Ass'n of the Midlands,* 131 F.R.D. 161 (D.Neb.1989), have adopted the same view.

Other federal courts, however, have elided the requirement for action by the head of the agency and allow the invocation of the deliberative-process doctrine by lower-level officials. For example, the D.C. Circuit allows agency heads to delegate their authority to invoke the "deliberative process privilege" (which is treated by the D.C. Circuit as a discrete privilege rather than part of an overarching "executive privilege") in the context of requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *See Judicial Watch,* 365 F.3d at 1121

(citing cases in which a "Pardon Attorney" invoked deliberative-process privilege); *Landry v. Federal Deposit Ins. Corp.,* 204 F.3d 1125, 1135–36 (D.C.Cir.2000) (discussing the deliberative-process and law-enforcement privileges and noting that "District courts in this Circuit have also allowed lesser officials to assert these privileges"). Following the lead of the D.C. Circuit, delegation has been allowed by trial courts in the Second Circuit, *see Martin v. Albany Bus. Journal, Inc.,* 780 F.Supp. 927 (N.D.N.Y.1992), in the Seventh Circuit, *see Moorhead v. Lane,* 125 F.R.D. 680 (C.D.Ill.1989), and in the Ninth Circuit, *see Sanchez v. Johnson,* 2001 WL 1870308 at *5 (N.D.Cal. Nov.19, 2001) ("[T]he duty to invoke the privilege cannot be delegated so far down the chain of command that purposes of the requirement [for an agency head's involvement] are undermined."). *See also Exxon Corp. v. Department of Energy,* 91 F.R.D. .26, 43–44 (N.D.Tex.1981) (allowing delegation with "case-specific content guidelines which will insure appropriate and consistent invocation of the privilege by the agency" in accord with precedent from the Temporary Emergency Court of Appeals).

Office of Civilian Radioactive Waste Management within the Department of Energy, respecting twenty-four documents related to the numerous spent nuclear fuel cases currently pending before this court. In *Yankee Atomic,* the court disregarded the precedent established by *Cetron,* wrongly describing it as *"dictum."* 54 Fed.Cl. at 310 n. 4. The court also sought to distinguish *Cetron* by focusing on the semantic use of the term "executive privilege" in lieu of "deliberative process privilege" by the Court of Claims. *Id.* In doing so, the court omitted to consider the substance of the privilege actually at issue in *Cetron, i.e.,* the attempt to withhold "intra-agency communications that contain opinions, conclusions, and reasoning of Government officials" absent a "proper" invocation of privilege. *Cetron,* 207 Ct.Cl. at 989. *Yankee Atomic* also misconstrued the Federal Circuit's adoption of TECA's precedent, citing *Consolidated Edison Co. of N.Y. v. Richardson,* 232 F.3d 1380, 1383 (Fed.Cir. 2000), for the notion that *Brett* is controlling precedent. *See Yankee Atomic,* 54 Fed.Cl. at 310 & n. 5. *Consolidated Edison,* however, specifically refers to *Texas American,* in which the Federal Circuit, *en banc,* made manifestly evident that TECA precedent was adopted only for the limited purposes of TECA cases. *See* 44 F.3d at 1561. In short, this Court disagrees with both the reasoning of *Yankee Atomic* and its result.

Consequently, the Court does not accept the government's contention that the long line of precedent of this Court and its predecessors should not be applied to the IRS in this action. Requiring the head of the agency personally to assert executive privilege after gaining familiarity with the documents and determining that their release would significantly impede the agency's operations serves the important function of ensuring that the privilege is invoked only when absolutely necessary. As the Supreme Court recently explained,

> Executive privilege is an extraordinary assertion of power "not to be lightly invoked." Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These "occasion[s] for constitutional confrontation between the two branches" should be avoided whenever possible.

*Cheney,* —— U.S. at ——, 124 S.Ct. at 2592 (internal citations omitted) (quoting *Reynolds,* 345 U.S. at 7, 73 S.Ct. 528; *Nixon,* 418 U.S. at 692, 94 S.Ct. 3090). Important reasons exist to preserve and respect the executive privilege. Correlatively, the Court must ensure that the discovery process be hindered only when necessary. *See Judicial Watch,* 365 F.3d at 1122 ("[O]urs is a democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value.") (citing *In re Sealed Case,* 121 F.3d 729, 749 (D.C.Cir.1997)).

Ms. Stevens's invocation of privilege applies to 339 documents encompassing over 4,000 pages—an invocation which in its bulk overshadows the government's deliberative-process claims made over the years to this Court and its predecessors on a combined basis. *See Zenith,* 764 F.2d at 1579 (fifteen documents); *Yankee Atomic,* 54 Fed.Cl. at 309 (twenty-four documents); *Abramson,* 39 Fed.Cl. at 295 (oral advice given at one meeting); *Walsky,* 20 Cl.Ct. at 319 (two documents); *CACI Field Servs.,* 12 Cl.Ct. at 688 & n. 4, n. 6 (identity of six members of an evaluation panel and their numerical ratings of proposals); *Cetron,* 207 Ct.Cl. at 985 (seven documents); *Kaiser Aluminum,* 157 F.Supp. at 942 (one document). Because the privilege was not asserted by the appropriate official, here the Commissioner of the IRS, the government's invocation of executive privilege to withhold the deliberative elements contained in the specified documents is rejected. To the extent the government seeks to assert executive privilege with respect to one or more of the 339 documents, it shall provide a formal invocation of the privilege by the Commissioner of the IRS on or before August 26, 2004. *See Scott Paper,* 943

F.Supp. at 503 (government given limited additional period to invoke privilege).[12] Otherwise, it shall produce by that date the documents identified on the February 3, 2003 privilege log and encompassed by Ms. Stevens's Declaration in accordance with the Rules of this Court.[13]

### Protective Order

In its opposition to Marriott's motion to compel, the government requests that the Court issue a "protective order directing that the documents sought by plaintiff are protected from disclosure." Def.'s Opp'n at 1. Pursuant to RCFC 26(c), the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The government has failed to make a showing that disclosing the documents it has withheld as privileged would be an "annoyance, embarrassment, [or] oppression" to the IRS or anyone else. The government has asserted that Marriott's timing in the filing of its motion to compel created an undue hardship on the government, *see supra*, at 414, but no such argument has been made in connection with producing the documents at issue. The government has already collected and identified the documents, and there is no reason to believe that producing them would engender an undue burden or expense. Accordingly, the Court denies the government's request for a protective order.

12. The deliberative-process privilege is not absolute and may be overcome by a showing by Marriott that it has a compelling need for the withheld material. *Sun Oil Co. v. United States*, 206 Ct.Cl. 742, 514 F.2d 1020, 1024 (1975); *Walsky*, 20 Cl.Ct. at 320. If Marriott contests any assertion the government might make of the privilege, Marriott should make a definite showing of facts indicating reasonable cause for judicial examination of the contested materials. *Kaiser Aluminum*, 157 F.Supp. at 947.

13. The descriptions provided in Ms. Stevens's Declaration include a number of documents for which the government appears to have alternative bases for withholding them from production. Most of these are related to the IRS's treatment of third parties' tax returns. *See, e.g.*, Pls.' App. Ex. D at 186 (Bates Nos. 9525–9535), 189 (Bates Nos. 9638–9640, 9641–9642). Within the descriptions for these documents, Ms. Stevens asserts that disclosure of third parties' information is barred from disclosure by Internal Revenue Code § 6103. This basis for withholding information is not reflected on the government's privilege log and has not been addressed by the parties. Also, it is not readily apparent from the description provided by Ms. Stevens how a few of the documents are responsive to Marriott's document requests. *See, e.g., id.* at 186 (Bates Nos. 9525–9535) (draft legal opinion written in connection with an unrelated Tax Court case). In all events, to the extent that any of the documents or portions of the documents encompassed by this opinion and order are exempted from disclosure by a basis other than executive privilege, *i.e.*, a specific statutory provision such as Section 6103, the government may withhold such information but must appropriately identify the grounds upon which it is withholding it in any future privilege log.

### CONCLUSION

For the reasons set forth above, Marriott's motion to compel is GRANTED in part and DENIED in part. The government's attempt to invoke the deliberative-process prong of executive privilege by way of submission of a privilege log and Ms. Stevens's Declaration is declared to be invalid. On or before August 26, 2004, the government shall either produce the documents encompassed by its privilege log dated February 3, 2003 and Ms. Stevens's Declaration, or it shall provide a formal invocation of the privilege by the Commissioner of the IRS by that date.

It is so ORDERED.